**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* STEPHEN M. SHEA -and- STEPHEN M. SHEA, Plaintiffs, v. VERIZON BUSINESS NETWORK SERVICES, INC.; VERIZON FEDERAL INC.; MCI COMMUNICATIONS SERVICES, INC. d/b/a VERIZON BUSINESS SERVICES; and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, Defendants. | No. 1:09-cv-01050-GK Pretrial Conference:  Not Yet Scheduled **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Randolph D. Moss (D.C. Bar No. 417749)
Jennifer M. O'Connor (D.C. Bar No. 460352)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
randolph.moss@wilmerhale.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................1

BACKGROUND ...........................................................................................................5

ARGUMENT ...............................................................................................................12

I.      THE SECOND AMENDED COMPLAINT MUST BE DISMISSED UNDER THE
        FCA'S FIRST-TO-FILE BAR ...................................................................................12

        A.      The First-To-File Bar Precludes Subsequent *Qui Tam* Actions Based On The
                Same Material Facts Alleged In A Prior Suit .......................................................12

        B.      Relator's 2009 Lawsuit Is Based On The Same Material Facts As The 2007
                Lawsuit.............................................................................................................14

II.     THE SECOND AMENDED COMPLAINT MUST BE DISMISSED UNDER THE
        FCA'S PUBLIC DISCLOSURE BAR .......................................................................20

        A.      The Public Disclosure Bar .................................................................................20

        B.      The Public Disclosure Bar Forecloses Relator's Claims Because They Are Based
                On Publicly Available Contract And Billing Information ....................................22

                1.      Relator's Information Regarding The Content Of The Contracts Is From
                        The Internet.........................................................................................23

                2.      Relator's Information Regarding The Content Of The Invoices That
                        Allegedly Contain Impermissible Charges Is From The Internet.............24

                3.      Material Available On Public Internet Sites Is Publicly Available ...........26

        C.      Any Purportedly Non-Public Information Relied Upon By Relator Was Merely
                Cumulative........................................................................................................26

        D.      Relator Is Not The Original Source ....................................................................29

III.    THE SECOND AMENDED COMPLAINT FAILS TO SATISFY THE PLEADING
        STANDARDS OF RULES 8 AND 9(b) .....................................................................31

        A.      Applicable Legal Standards ................................................................................31

        B.      The Second Amended Complaint Fails To Plead Facts Sufficient To Support The
                Inference That Fraud Occurred............................................................................32

i

1.      The Second Amended Complaint Fails To Demonstrate That The Named Contracts Prohibited The Surcharges.........................................................32

2.      The Second Amended Complaint Lacks Allegations Sufficient To Demonstrate That Any Improper Billings Actually Occurred..................36

3.      The Second Amended Complaint Fails To Identify *When* The Allegedly Fraudulent Claims Were Made ................................................................37

4.      The Second Amended Complaint Fails To Identify With Particularity *Who* Made The Allegedly Fraudulent Statements Or Claims...........................38

IV.     DISMISSAL SHOULD BE WITH PREJUDICE............................................................39

CONCLUSION.........................................................................................................................42

# TABLE OF AUTHORITIES

## CASES

*Acosta Orellana v. CropLife International*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ........................................................41, 42

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................3, 31, 37

*\*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................31

*Boone v. MountainMade Foundation*,
    684 F. Supp. 2d 1 (D.D.C. 2010) ........................................................3, 32

*Coalition for Underground Expansion v. Mineta*,
    333 F.3d 193 (D.C. Cir. 2003) ...............................................................23

*Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*,
    130 S. Ct. 1396 (2010) ............................................................................21

*Grynberg v. Koch Gateway Pipeline Co.*,
    390 F.3d 1276 (10th Cir. 2004) .............................................................13

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) .................................................................42

*\*Kowal v. MCI Communications Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ..........................................................31, 41

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    131 S. Ct. 1885 (2011) ............................................................................21

*Sharma v. District of Columbia*, Civ. A. No. 10-1033(GK),
    2012 WL 3195141 (D.D.C. Aug. 8, 2012) ............................................31

*United States ex rel. Folliard v. Synnex Corp.*,
    798 F. Supp. 2d 66 (D.D.C. 2011), ..........................................13, 14, 17

*United States ex rel. Bane v. Life Care Diagnostics*,
    No. 8:06-cv-467-T-33MAP, 2008 WL 4853599 (M.D. Fla. Nov. 10, 2008) ..........................19

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 28 (D.D.C. 2003) ........................................................38

*United States ex rel. Batiste v. SLM Corp.,*
   659 F.3d 1204 (D.C. Cir. 2011) .............................................................12, 13, 17, 18

*United States ex rel. Bender v. N. Am. Telecommunications, Inc.,*
   686 F. Supp. 2d 46 (D.D.C. 2010) ...............................................................32, 38, 39

*United States ex rel. Brown v. Walt Disney World Co.,*
   No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975 (M.D. Fla. June 24, 2008) .....................26

*United States ex rel. Chovanec v. Apria Healthcare Group Inc.,*
   606 F.3d 361 (7th Cir. 2010) ..................................................................................18

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,*
   290 F.3d 1301 (11th Cir. 2002) ..............................................................................40

*United States ex rel. Davis v. District of Columbia,*
   679 F.3d 832 (D.C. Cir. 2012) .................................................................21, 27, 29

*United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.,*
   778 F. Supp. 2d 37 (D.D.C. 2011) .........................................................................38, 39

*United States ex rel. Eisenstein v. City of New York,*
   556 U.S. 928 (2009)..............................................................................................41

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Group, Inc.,*
   332 F. Supp. 2d 1 (D.D.C. 2003) ............................................................................13

*United States ex rel. Findley v. FPC-Boron Employees' Club,*
   105 F.3d 675 (D.C. Cir. 1997) ................................................................................30

*United States ex rel. Fine v. Advanced Sciences, Inc.,*
   99 F.3d 1000 (10th Cir. 1996) ................................................................................13

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.,*
   722 F. Supp. 2d 37 (D.D.C. 2010) ....................................................................14, 17, 19

*United States ex rel. Folliard v. Synnex Corp.,*
   798 F. Supp. 2d 66 (D.D.C. 2011) ....................................................................13, 14, 17

*United States ex rel. Gagne v. City of Worcester,*
   565 F.3d 40 (1st Cir. 2009)....................................................................................40

*United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund,*
   843 F. Supp. 2d 20 (D.D.C. 2012) ....................................................................21, 23, 26

iv

*United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.,
  318 F.3d 214 (D.C. Cir. 2003) ...............................................................2, 12, 13, 18

United States ex rel. Head v. Kane Co.,
  798 F. Supp. 2d 186 (D.D.C. 2011) .....................................................31, 33, 37, 38

United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,
  498 F. Supp. 2d 25 (D.D.C. 2007) ........................................................................27

United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Group, Inc.,
  422 F. Supp. 2d 225 (D.D.C. 2006) ...............................................................21, 28

United States ex rel. Joshi v. St. Luke's Hosp., Inc.,
  441 F.3d 552 (8th Cir. 2006) ..........................................................................40, 41

*United States. ex rel. Karvelas v. Melrose-Wakefield Hosp.,
  360 F.3d 220 (1st Cir. 2004) ...........................................................................40, 41

United States ex rel. Lujan v. Hughes Aircraft Co.,
  243 F.3d 1181 (9th Cir. 2001) ...............................................................................17

United States ex rel. Ortega v. Columbia Healthcare, Inc.,
  240 F. Supp. 2d 8 (D.D.C. 2003) ....................................................................13, 14

United States ex rel. Poteet v. Medtronic, Inc.,
  552 F.3d 503 (6th Cir. 2009) ...........................................................................12, 13

United States ex rel. Russell v. Epic Healthcare Management Group,
  193 F.3d 304 (5th Cir. 1999) ..................................................................................41

United States ex rel. Settlemire v. District of Columbia,
  198 F.3d 913 (D.C. Cir. 1999) ...............................................................................22

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,
  14 F.3d 645 (D.C. Cir. 1994) ..............................................................21, 22, 27, 28, 29

United States ex rel. Totten v. Bombardier Corp.,
  286 F.3d 542 (D.C. Cir. 2002) ...............................................................................32

United States ex rel. Unite Here v. Cintas Corp.,
  No. C 06-2413 PJH, 2007 WL 4557788 (N.D. Cal. Dec. 21, 2007) ......................26

United States ex rel. Vuyyuru v. Jadhav,
  555 F.3d 337 (4th Cir. 2009) ...........................................................................21, 22

v

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
   389 F.3d 1251 (D.C. Cir. 2004) .......................................................32, 37, 38, 39

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ........................................................................40

*United States v. Science Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ..............................................................39, 40

**STATUTES**

31 U.S.C. § 3730(b)(2) .............................................................................18, 41

31 U.S.C. § 3730(b)(5) .............................................................2, 12, 13, 14, 20

31 U.S.C. § 3730(d) ...................................................................................40, 41

31 U.S.C. § 3730(e)(4).............................................................................2, 20, 41

31 U.S.C. § 3730(e)(4) (2009) ..........................................................................23

31 U.S.C. § 3730(e)(4)(A) (2009) .....................................................................21

31 U.S.C. § 3730(e)(4)(B) (2009)..........................................................29, 30, 31

31 U.S.C. § 3730(e)(4)(B) (2012)......................................................................30

**REGULATIONS**

48 C.F.R. § 52.229-4(b) .............................................................................35, 36

**RULES**

Federal Rule of Civil Procedure 8 ..........................................3, 5, 31, 32, 37, 39

Federal Rule of Civil Procedure 9(b)..........................3, 5, 31, 32, 37, 38, 39, 41, 42

Federal Rule of Civil Procedure 12(b)(1) ..........................................12, 13, 31

Federal Rule of Civil Procedure 12(d)...............................................................23

D.C. District Court Rule 40.5(3)........................................................................16

**OTHER**

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266...............................39

* Authorities upon which we chiefly rely

## INTRODUCTION

In this *qui tam* complaint under the False Claims Act ("FCA"), Relator Stephen M. Shea ("Relator") alleges that Defendants Verizon Business Network Services, Inc., Verizon Federal Inc., and MCI Communications Services, Inc. d/b/a Verizon Business Services (collectively, "Verizon") and Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") improperly billed the Government for certain taxes and surcharges that purportedly were not permitted under certain contracts.  The case is a near carbon copy of the action Relator filed against Verizon in 2007 in this Court.  In that case (the "2007 Lawsuit"), Relator alleged that Verizon had improperly billed taxes and surcharges under two related government contracts that allegedly permitted recovery of only certain specified charges.  Relator claimed in the 2007 Lawsuit to have gained knowledge of Verizon's allegedly improper billing from his work as a telecommunications consultant and from a leaked document.  The case settled without an admission of liability after the Government intervened.

In the present action (the "2009 Lawsuit"), Relator brings no new information to bear. He merely reasserts the allegations from his 2007 Lawsuit and claims that they also apply to 20 additional Verizon and Verizon Wireless contracts whose names he located on the Internet. Relator does not make particularized allegations about what taxes and surcharges are permitted by those additional contracts or whether Defendants in fact billed for such taxes and surcharges. Instead, he simply assumes, "on information and belief," that because Defendants allegedly improperly billed for taxes and surcharges for the contracts at issue in the 2007 Lawsuit, the same is true for 20 other of Defendants' contracts.  The United States has not intervened in the present action.

Relator's complaint in this case—his Second Amended Complaint—must be dismissed in its entirety for three independent reasons:

1

*First*, this action is barred by 31 U.S.C. § 3730(b)(5), which provides that "[w]hen a person brings an action under this subsection, *no person other than the Government* may intervene or bring a *related action based on the facts underlying the pending action*." (Emphasis added.) Section 3730(b)(5)'s jurisdictional bar applies where a relator seeks to pursue on behalf of the United States a case that "incorporat[es] the same material elements of fraud as an action filed earlier." *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003). Only the Government, having been put on notice of the prior action, may bring such a related case. Here, there can be little doubt that § 3730(b)(5) forecloses Relator's claims. Relator has conceded that this action is "related" to the 2007 Lawsuit, *see* SAC ¶ 5 & Civil Cover Sheet (Dkt. No. 1), and a simple comparison of the complaints in the two actions confirms that they are based on the same material elements of alleged fraud. *See also* Decl. of Randolph D. Moss (Sept. 12, 2012) ("Moss Decl."), Ex. 1 (Shea Dep. 150:5-6) (acknowledging that "a lot of the issues are the same" between his two lawsuits) (hereinafter "Shea Dep."). Because Relator's 2007 Lawsuit put the Government on notice of the fraud alleged in the present case, Relator's current *qui tam* suit cannot proceed.

*Second*, the FCA's "public disclosure" bar, 31 U.S.C. § 3730(e)(4), forecloses the present action. Section 3730(e)(4) requires dismissal of a *qui tam* action where the material elements of the allegation of fraud were previously "publicly disclosed" in certain specified sources—including court filings and in the media—unless the relator is the "original source" of the information disclosed. The "material elements" of Relator's allegations in this case are that (1) 20 Verizon contracts disallowed certain surcharges and (2) Verizon invoiced the government for those surcharges. Relator concedes that he found the information that allegedly demonstrates those material elements—certain "chunks" of contract language and "mock-up billing and billing

presentations"—on the Internet.  *See* Shea Dep. 152:18-153:2; *see also, e.g.*, Shea Dep. 21:12-

17; 25:4-7; 40:16-41:5; 51:5-8; 53:21-54:2; 55:14-15; 56:7-21; 59:1-3; 62:15-16; 100:17-21;

104:1-2; 106:11-13; 108:7-8; 109:12-15; 110:2-3; 113:1-3; 119:9-17; 120:2-7; 127:4-6; 137:9-

10; 142:9-16; 147:12-13.  Relator, moreover, was not an "original source" of any of the relevant

information.  As a result, this action is foreclosed under the "public disclosure" bar.

        *Third*, the Second Amended Complaint fails to meet the pleading requirements of Federal

Rules of Civil Procedure 8 and 9(b).  Under Rule 8, conclusory assertions are insufficient;

supporting facts demonstrating that the claim is more plausible than other possibilities must be

alleged.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  And under Rule 9(b)—

applicable to claims under the False Claims Act—a plaintiff must plead with particularity details

regarding the "who, what, when, where, and how" of the fraud.  *Boone v. MountainMade*

*Found.*, 684 F. Supp. 2d 1, 8 (D.D.C. 2010).  Relator's Second Amended Complaint satisfies

neither standard.  It does not plead facts sufficient to show that the contracts at issue prohibited

the billing practices alleged.  While the Second Amended Complaint alleges that Defendants

fraudulently billed the United States on 20 separate contracts, it does not identify a single

contractual provision that Verizon allegedly violated.  Indeed, Relator concedes that he has not

even read many of the contracts at issue and has reviewed only "chunks" of others.  *See, e.g.*,

Shea Dep. 117:1-3 ("I have not read every single one of these contracts in their entirety because I

don't have them."); *id.* at 28:12-14, 18-20; 34:4-5; 40:20-21; 51:5-6; 100:20-21; 104:7-8; 106:18-

19. For 18 of the 20 contracts, the Second Amended Complaint does not set forth any terms or

conditions; for another, the Second Amended Complaint quotes operative contractual language,

but that language itself makes clear that certain types of surcharges were permitted; and, for the

last, the Second Amended Complaint merely quotes language from various modifications to the

contract (but not the contract itself), none of which supports Relator's claims.  Nor does the Second Amended Complaint provide any particularized allegations regarding the purportedly fraudulent claims.  The Second Amended Complaint does not identify any *particular* surcharge that was allegedly billed in violation of any *particular* contractual term or condition.  It does not identify a single invoice containing a prohibited tax or surcharge.  It does not allege even a general time frame for the purported fraud, and it does not identify anyone allegedly involved in the purported fraud.  Because it lacks allegations providing any "particularity" regarding these essential elements of a fraud claim, the Second Amended Complaint cannot stand.

For each of these reasons, this case should be dismissed.  Relator's role under the False Claims Act was completed when his 2007 Lawsuit was settled and he obtained a substantial reward for having notified the Government that Verizon was allegedly improperly billing certain taxes and surcharges.  The decision whether to pursue a related action along the lines of the one Relator now asserts—an action that simply seeks to extend previously disclosed theories of fraud to *publicly identifiable* contracts—is for the Government alone to make.  Verizon emphatically disputes that it has engaged in the fraud Relator alleges.  But if the Government were for some reason to reach a contrary conclusion, it no doubt could and would take action to seek to protect its interests.  Because the Government has not done so here, the Second Amended Complaint should be dismissed.

Finally, dismissal of this action should be with prejudice.  Relator has already amended his complaint and should not be permitted to file an additional complaint.  Relator cannot plead around the first-to-file and public disclosure bars, which arise from the fundamental nature of this action.  For the reasons explained below, moreover, Relator is not entitled to attempt to cure the deficiencies in his pleadings under Federal Rules of Civil Procedure 8 and 9(b).

# BACKGROUND

**Relator's 2007 Lawsuit Against Verizon**

Relator filed his first *qui tam* complaint against Verizon on January 17, 2007.  *See* Moss
Decl., Ex. 2 (Civ. No. 1:07-cv-0111(GK) (Dkt. No. 1)) (hereianfter "2007 Compl.").  The 2007
complaint explained that the "action concern[ed] the knowing submission to the United States of
certain prohibited surcharges under contracts to provide telecommunications services between
defendant Verizon Communications Inc (and its division Verizon Business) and the General
Services Administration."  2007 Compl. ¶ 2.  Relator claimed that he "discovered the false and
fraudulent claims that are at issue in this case through his extensive work as a private
telecommunications consultant to Fortune 100 companies including reviewing invoices to ensure
that the vendors ha[d] correctly implemented the negotiated contracts."  *Id.* ¶ 12.  The complaint
alleged that "[d]uring the course of this work for private clients, Relator Shea became aware of
the practice of MCI billing corporate clients not only for federal, state and local taxes levied on
the customer but also for surcharges (often labeled as, or lumped together with, taxes) that were
added to bills by MCI to inflate the revenue it received for telecommunication services."  *Id.*
Relator then claimed he "learned that MCI was attempting to pass on the same surcharges to the
United States under its FTS2001 Contract even though Federal Acquisition Regulations (FAR)
and the terms of the FTS2001 Contract precluded such surcharges."  *Id.* ¶ 13.  The complaint

also alleged that Verizon continued MCI's billing practices after the 2006 merger between MCI and Verizon. *See id.* ¶ 69.[1]

Specifically, the complaint alleged that "[o]n or about August 13, 2004, Relator Shea received an MCI document that purported to show 'the taxes and surcharges that the Federal Government is responsible for.'" *Id.* ¶ 70.[2]  The complaint alleged that "MCI appear[ed] to have been invoicing the United States in the same way it invoiced many of its commercial clients notwithstanding the terms of the FTS2001 Contract and governing FAR regulations," *id.* ¶ 79, and that "MCI used the same billing platform that it used for enterprise [or corporate] customers to bill the United States without modifying its systems to reflect the terms of the FTS2001 Contract," *id.* ¶ 80.  Similarly, the complaint alleged that "Verizon Business also uses the same billing platform that it uses for its business customers to bill the United States without modifying its systems to reflect the terms of the FTS2001 Contract or the FTS2001 Bridge Contract." *Id.* ¶ 81.  Relator pointed to multiple specific provisions of the FTS2001 and FTS2001 Bridge Contracts that he claimed disallowed the charges, *id.* ¶¶ 30-45, along with particular aspects of the "Cost Proposal" for those agreements, *id.* ¶¶ 46-61, which he claimed demonstrated that Verizon's imposition of surcharges was improper under the terms of the contracts.

---

[1] Verizon Communications Inc., the parent company initially named in this action, was formed on June 30, 2000, with the merger of Bell Atlantic Corp. and GTE Corp.  *See* http://www22.verizon.com/investor/corporatehistory.htm.  As the Second Amended Complaint acknowledges, Verizon did not acquire MCI (which had previously been named Worldcom) until 2006.  *See* SAC ¶¶ 3, 6.  Verizon also has numerous subsidiaries that predate the merger.  *See, e.g., id.* ¶ 6 (listing subsidiaries).  It is also a partial owner of Cellco Partnership, which operates as Verizon Wireless.  *See id.* ¶ 10.  The other co-owner of Cellco Partnership is Vodafone, a British telecommunications company.  *Id.*

[2] The document allegedly showed that MCI billed the government the following charges: "Federal Regulatory Fee surcharges, state sales, excise and utility taxes; and surcharges based on the following state and local fees, contributions and taxes assessed on the carrier: public utility commission fees, state universal service fund and high cost fund contributions; state 'deaf taxes;' state and local gross receipts taxes; business license fees; 911 taxes; tele-relay service charges; ad valorem taxes; business, occupational and franchise taxes."  *Id.* ¶ 71.

The United States intervened in the 2007 Lawsuit, and the parties reached a settlement agreement in February 2011 that did not include any admission of liability.

**Relator's Initial Complaint in the Current Lawsuit**

While the 2007 Lawsuit remained pending, Relator filed the current case—a second *qui tam* complaint against Verizon (the "2009 Lawsuit"). Relator filed the 2009 Lawsuit as a "related case" to the 2007 Lawsuit. *See* 2009 Compl. ¶ 7 (Dkt. No. 1) ("In 2007, Relator Stephen Shea filed a related action, Civ. Action No. 07CV0111 (GK) …."); Civil Cover Sheet (marking related case box). Relator himself acknowledges that "a lot of the issues are the same" in his two lawsuits. Shea Dep. 150:5-6. Like the 2007 complaint, Relator's 2009 complaint alleged that Verizon "knowingly submits claims to the United States for payment of illegal surcharges under contracts to provide telecommunication services." 2009 Compl. ¶ 2; *cf.* 2007 Compl. ¶ 2.

Just as in the 2007 complaint, Relator claimed in the 2009 complaint that he "discovered the false and fraudulent claims that are at issue in this case through his extensive work as a private telecommunications consultant to Fortune 100 companies including reviewing invoices to ensure that the vendors ha[d] correctly implemented the negotiated contracts." 2009 Compl. ¶ 22; cf. 2007 Compl. ¶ 12. The 2009 complaint also repeated the allegation from the 2007 complaint that "[d]uring the course of this work for private clients, Relator Shea became aware of the practice of MCI billing corporate clients not only for federal, state and local taxes levied on the customer but also for surcharges (often labeled as, or lumped together with, taxes) that were added to bills by Verizon to inflate the revenue it received for telecommunications services." 2009 Compl. ¶ 22; *cf.* 2007 Compl. ¶ 12. The 2009 complaint then, again, alleged that Relator "learned that MCI was attempting to pass on the same illegal surcharges, designated

as "'federal, state and local taxes,' 'fees,' 'surcharges,' or 'tax-like surcharges' and other similar

names to the United States," 2009 Compl. ¶ 23, and that Verizon allegedly was doing the same,

*see id*. ¶ 24; *cf*. 2007 Compl. ¶ 13.

Again in the 2009 complaint, Relator identified the same source of his supposed insider

knowledge:  "On or about August 13, 2004, Relator Shea received an MCI document that

purported to show 'the taxes and surcharges that the Federal Government is responsible for.'"

2009 Compl. ¶ 52; *cf*. 2007 Compl. ¶ 70.[3]  The 2009 complaint also then alleges that "Verizon is

invoicing the United States in the same way that it invoices many of its business customers

notwithstanding the governing FARs or applicable contracts," 2009 Compl. ¶ 80; *cf*. 2007

Compl. ¶ 79, and again alleged that "Verizon uses the same billing systems that it uses for its

business customers to bill the United States without modifying these systems to reflect the terms

of the contracts with the United States or the FARs," 2009 Compl. ¶ 80; *cf*. 2007 Compl. ¶¶ 80-

81.

Relator made no attempt in the 2009 Lawsuit to distinguish the theory or circumstances

of fraud that he asserted in the 2007 Lawsuit.  Indeed, Relator explicitly connected the two

complaints under a single theory of fraud, stating that the 2009 Lawsuit "alleges that Verizon's

pattern and practice of submitting false claims extends beyond the FTS2001 and FTS2001

Bridge Contract."  2009 Compl. ¶ 15.  Relator asserted that his allegations of fraud applied to

"multiple contracts including, but not limited to, the contracts for wireless services including

WITS2001 administered by GSA, the Metropolitan Area Acquisition (MAA) contract

administered by GSA, and contracts held by the Department of Defense, the United States Postal

---

[3] The document allegedly showed that MCI billed the Government for the same taxes and
surcharges alleged in the 2007 Lawsuit.  *See* 2009 Compl. ¶ 53; *cf*. 2007 Compl. ¶ 71.

8

Service, the United States House of Representatives and the United States Senate, and other federal agencies." *Id.*

In November 2011, the United States informed this Court that it was "not intervening at this time" in the 2009 Lawsuit. *See* Notice Of The United States That It Is Not Intervening At This Time (Dkt. No. 26).

**Relator's Amended Complaint in the Current Lawsuit**

Although the 2009 Lawsuit was unsealed on March 29, 2012, Relator did not serve the existing complaint at that time. Instead, Relator filed a First Amended Complaint almost four months after the case was unsealed and over three years after the initial complaint was filed. On September 12, 2012, Relator filed a Second Amended Complaint ("SAC") that is substantively identical to the First Amended Complaint but (at Defendants' request) substitutes three Verizon subsidiaries in place of Verizon Communications Inc.[4] Like the initial complaint in this action, the Second Amended Complaint acknowledges that this suit is "related" to the 2007 Lawsuit (*see* SAC ¶ 5) and attempts to extend the allegations from Relator's now-settled 2007 Lawsuit to additional Verizon government contracts.

Like the prior complaints, the Second Amended Complaint alleges that Relator discovered the purported fraud while "consulting with large commercial telecommunications customers." SAC ¶ 3; *cf.* 2009 Compl. ¶ 22; 2007 Compl. ¶ 12. It alleges that as a consultant, Relator "learned that most telecommunication carriers, including Worldcom, later named MCI Communications Corp., acquired by Verizon in 2006 (collectively 'MCI/Verizon'), had a custom

---

[4] *See* Stipulation Regarding Amended Complaint. (Dkt. No. 48) at 3 ("IT IS HEREBY STIPULATED by the parties—subject to approval by the Court—that Relator will file a Second Amended Complaint that is substantively identical to the First Amended Complaint but substitutes Verizon Business Network Services, Inc.; Verizon Federal Inc.; and MCI Communications Services, Inc. d/b/a Verizon Business Services in place of Verizon Communications Inc.").

and practice of charging" certain taxes and surcharges.  SAC ¶ 3; *cf.* 2009 Compl. ¶ 22; 2007

Compl. ¶ 12.[5]  The Second Amended Complaint then alleges that "MCI/Verizon overcharged

the United States, just like its commercial customers."  SAC ¶ 4; *see also id.* ¶ 27; 2009 Compl.

¶ 24; 2007 Compl. ¶ 13.

Specifically, the Second Amended Complaint—like the prior complaints—alleges the

source of Relator's purported insider knowledge:  "In 2004, Shea received an MCI document

indicating that the company was charging the government for regulatory fee surcharges, and

various state taxes, including utility taxes, ad valorem/property taxes, and business, occupational,

and franchise taxes."  SAC ¶ 4; *cf.* 2009 Compl. ¶ 52; 2007 Compl. ¶ 70.  The Second Amended

Complaint further alleges—again like the prior complaints, but this time referencing an unnamed

"former Verizon employee"—that "Verizon did not have a separate billing system for federal

customers and commercial customers."  SAC ¶ 27; *cf.* 2009 Compl. ¶ 80; 2007 Compl. ¶¶ 80-81.

In the Second Amended Complaint, Relator then asserts that his allegations apply not only to the

FTS2001 and FTS2001 Bridge Contracts, but also to 20 additional contracts between Defendants

and the United States—each of which is listed on publicly accessible websites.  The only facts

Relator provides about these 20 contracts, however, he admittedly gleaned from the Internet.  *See*

Shea Dep. 152:18-153:2; *see also, e.g.*, Shea Dep. 21:12-17; 25:4-7; 40:16-41:5; 51:5-8; 53:21-

54:2; 55:14-15; 56:7-21; 59:1-3; 62:15-16; 100:17-21; 104:1-2; 106:11-13; 108:7-8; 109:12-15;

110:2-3; 113:1-3; 119:9-17; 120:2-7; 127:4-6; 137:9-10; 142:9-16; 147:12-13.

---

[5] The taxes and surcharges alleged to have been improperly billed are described as:  "'Federal,
State and local taxes,' 'fees,' 'surcharges,' 'tax-like surcharges' (and similar names), state and
local 911 charges, state service universal service funds, public utility commission fees, Federal
Regulatory Fees/Common Carrier Recovery Charges ('CCRC'), Federal Universal Service
Charges, ad valorem/property taxes, and business, occupational, and franchise taxes."  SAC ¶ 3.
Assuming its own conclusion, the Second Amended Complaint calls these charges "Non-
Allowable Tax-Like Charges."  *Id.*

Beyond the general allegation that Defendants committed fraud with respect to each agreement, the Second Amended Complaint provides no specific allegations supporting Relator's claims. Notably, the Second Amended Complaint does not contain allegations supporting the claim that any particular contract at issue prohibited passing along any particular surcharge that Verizon allegedly charged the Government. Other than listing them by name, the Second Amended Complaint provides no detail at all for 17 of the 20 contracts at issue.[6] Although Relator's claims depend on the notion that the listed contracts prohibited Defendants from imposing certain surcharges on the Government, the Second Amended Complaint does not even set forth or describe the operative contractual provisions for almost all of the 20 listed contracts. *Cf.* Shea Dep. 44:22-45:3 (Relator agrees that "different contracts have different surcharge provisions"). In fact, Relator admits that he does not know this information at this stage, and instead hopes to rely on discovery to construct his case. *See* Shea Dep. 192:19-22 ("I don't know what I don't know. But … when we see the documents and the invoicing we're going to know."); *id.* at 34:4-6 ("Again, I haven't read and seen every -- every single full whole contract. And I'm -- I'm anticipating to see that."). As to the couple of listed agreements for which the Second Amended Complaint refers to relevant contractual language—which Relator never read in their entirety, *see, e.g.*, *id.* at 117:1-3; 122:11-14; 142:9-11—the allegations do not support Relator's claims. *See* SAC ¶¶ 30, 32-40. Moreover, the Second Amended Complaint does not even set forth the general time frame for Relator's allegations, much less identify the specific time of each purportedly false claim. Nor does the Second Amended Complaint contain any allegations regarding the amounts of the allegedly false claims or the particular

---

[6] Indeed, Relator readily admits that he has not even read many of the contracts at issue or has reviewed only "chunks" of them that he obtained on the Internet. *See, e.g.*, Shea Dep. 28:12-14; 34:4-5; 40:20-21; 51:5-6; 100:20-21; 104:7-8; 106:18-19; 117:1-3; *see also* Moss Decl., Ex. 3 (Verizon Federal Contract User Guide).

circumstances of the claims.  The Second Amended Complaint does not make allegations

regarding any particular person asserted to be involved in the purported fraud or provide any

detail regarding the alleged fraudulent scheme.

## ARGUMENT

## I.     THE SECOND AMENDED COMPLAINT MUST BE DISMISSED UNDER THE FCA'S FIRST-TO-FILE BAR

The Second Amended Complaint must be dismissed under Federal Rule of Civil

Procedure 12(b)(1) because the Court lacks jurisdiction over a suit by a private relator—rather

than the Government—under the FCA's "first-to-file" bar, 31 U.S.C. § 3730(b)(5).

### A.     The First-To-File Bar Precludes Subsequent *Qui Tam* Actions Based On The Same Material Facts Alleged In A Prior Suit

When Congress amended the False Claims Act in 1986, it sought to "walk a fine line

between encouraging whistle-blowing and discouraging opportunistic behavior" of relators who

bring repetitive suits.  *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318

F.3d 214, 217 (D.C. Cir. 2003) (internal quotation marks omitted).  As part of that effort,

Congress enacted the "first-to-file" bar, which prohibits relators—but not the Government—

from bringing "a related action based on the facts underlying [a] pending action."  31 U.S.C.

§ 3730(b)(5); *see Hampton*, 318 F.3d at 217.  The D.C. Circuit has explained that the first-to-file

bar serves the "twin goals of rejecting suits which the government is capable of pursuing itself,

while promoting those which the government is not equipped to bring on its own."  *United States*

*ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1208 (D.C. Cir. 2011) (quoting *Hampton*, 318 F.3d

at 217); *see also United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516 (6th Cir.

2009) (noting that interpretation of the first-to-file rule should comport with the policy of

"ensuring that the government has notice of the essential facts of an allegedly fraudulent

scheme" (internal citations omitted)); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276,

1279 (10th Cir. 2004) ("Once the government is put on notice of its potential fraud claim, the

purpose behind allowing *qui tam* litigation is satisfied.").

The first-to-file bar is jurisdictional.  *See, e.g.*, *United States ex rel. Ortega v. Columbia

*Healthcare, Inc.*, 240 F. Supp. 2d 8, 11 (D.D.C. 2003) ("If an action 'based on the facts

underlying' a pending case comes before a court, it must dismiss the later-filed case *for lack of

jurisdiction*." (emphasis added)); *see also Batiste*, 659 F.3d at 1206-1207 (affirming dismissal

for "lack of subject matter jurisdiction"); *id.* at 1208 ("Appellate courts review *de novo* the

dismissal of a complaint *for lack of jurisdiction*" (emphasis added)).  A motion to dismiss for

lack of subject matter jurisdiction under Rule 12(b)(1) requires the plaintiff to establish that the

court has jurisdiction to hear his claims.  *United States ex rel. Ervin & Assocs., Inc. v. Hamilton

Sec. Group, Inc.*, 332 F. Supp. 2d 1, 4 (D.D.C. 2003) (citing *United States ex rel. Fine v.

Advanced Scis., Inc.*, 99 F.3d 1000, 1003 (10th Cir. 1996)).  Thus, Relator bears the burden of

demonstrating that the Second Amended Complaint is not sufficiently related to the 2007

complaint to trigger the first-to-file bar.  Relator cannot meet this burden.

The touchstone for whether a *qui tam* suit is "related" to another action under the first-to-

file bar is whether the first action "gave the government sufficient notice to discover the

allegedly fraudulent [activity]."  *United States ex rel. Folliard v. Synnex Corp.*, 798 F. Supp. 2d

66, 73 (D.D.C. 2011).  Thus, it is well established in this Circuit that § 3730(b)(5) bars any

action "incorporating the same material elements of fraud as an action filed earlier."  *Hampton*,

318 F.3d at 217.  The D.C. Circuit has expressly rejected the notion that the first-to-file bar

precludes only successive suits based on "identical facts," *see id.* at 218, because "interpreting

section 3730(b)(5) to bar only suits alleging facts identical to those in previous actions would

defeat the law's primary objectives," *Synnex Corp.*, 798 F. Supp. 2d at 72 (quoting *United States

13

*ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 233 (3d Cir.

1998)).  Instead, a relator may overcome the first-to-file bar only if he or she can demonstrate

that the later-filed suit alleges "a different *type* of wrongdoing, based on different material facts."

*Synnex Corp.*, 798 F. Supp. 2d at 73 (emphasis in original) (internal quotation marks omitted).  A

second suit is barred "if it contains 'merely variations' of the fraudulent scheme described in the

first action."  *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 37, 40

(D.D.C. 2010) ("*CDW II*") (quoting *Hampton*, 318 F.3d at 218).  Under the first-to-file bar, the

Court must compare the two complaints "at a sufficiently high level of generality."  *CDW II*, 722

F. Supp. 2d at 41*; see also Synnex Corp.*, 798 F. Supp. 2d at 72.

> **B.**     **Relator's 2009 Lawsuit Is Based On The Same Material Facts As The 2007 Lawsuit**

Because Relator's Second Amended Complaint alleges the same material elements of

fraud (and even the same supporting facts) as the 2007 complaint, it must be dismissed under the

first-to-file bar.  The 2009 Lawsuit is a prototypical example of a successive suit that brings no

material new information to the Government's attention and therefore provides no additional

benefit to the Government.  It simply takes a theory of fraud that Relator asserted in his prior

2007 *qui tam* lawsuit and guesses that the same theory might apply to additional government

contracts.

"When evaluating a § 3730(b)(5) first-to-file motion to dismiss, the only evidence needed

to determine if the complaint is barred is the complaints themselves."  *Synnex Corp.*, 798 F.

Supp. 2d at 72 (quoting *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp.

2d 8, 15 (D.D.C. 2003)) (internal quotation marks and alterations omitted).  Here, a comparison

of the 2007 complaint to the Second Amended Complaint demonstrates that the material

elements of the alleged fraud, as well as the alleged facts supporting those elements, are

strikingly similar in all relevant respects:

| Allegation | 2007 Complaint | Second Amended Complaint |
| --- | --- | --- |
| *Type of Fraud* | "This action concerns the knowing submission to the United States of certain prohibited surcharges under contracts to provide telecommunication services." ¶ 2. | "This lawsuit is based on a scheme by Defendants … to defraud the United States by knowingly billing the government for non-allowable surcharges." SAC ¶ 1. |
| *Specific Allegations* | Verizon submitted line item charges "that reflected [its] cost of doing business" and therefore were not reimbursable. ¶ 68. | Verizon "billed the government for Non-Allowable Tax-Like Charges" and concealed that such "charges are imposed not on the United States, but on the carrier, as a cost of doing business." ¶ 26. |
| *Legal Arguments* | Verizon was prohibited from charging for the surcharges under FAR 52.229-04 and the provisions of the contract. ¶¶ 4, 20. | Verizon was prohibited from charging for the surcharges under FAR 52.229-04 and the provisions of the contracts. ¶¶ 22, 29. |
| *Circumstances of Discovery* | Relator discovered fraud "through his extensive work as a private telecommunications consultant" and "became aware of the practice of [Verizon] billing corporate clients … for surcharges." ¶ 12. | Relator discovered fraud "[b]ased on his experience consulting with large commercial telecommunications customers" and learned "that most telecommunication carriers, including [Verizon], had a custom and practice of charging [surcharges.]" ¶ 3. |
| *Specific Source of Knowledge* | "On or about August 13, 2004, Relator Shea received an MCI document that purported to show 'the taxes and surcharges that the Federal Government is responsible for.'" ¶ 70; *see also* Moss Decl., Ex. 4 (Decl. of Relator Stephen Shea in Supp. of Mot. for Relator Share Award (Dkt. No. 63-2) ¶ 18) (hereinafter "Shea Decl.") ("The primary basis of my allegations was an 'insider' MCI document that I received from a MCI contact that purported to show 'the taxes and surcharges that the Federal | "In 2004, Shea received an MCI document indicating that the company was charging the government for regulatory fee surcharges, and various state taxes, including utility taxes, ad valorem/property taxes, and business, occupational, and franchise taxes." ¶ 4. |

15

| | Government is responsible for."); *id.* ¶ 19. | |
|---|---|---|
| *Allegations About Verizon's General Billing Practices* | Verizon "use[d] the same billing platform that it uses for its business customers to bill the United States without modifying its systems…" ¶ 81.  *See also* Shea Decl. ¶ 8 ("I learned from two MCI insiders in a position to know about tax and surcharge issues, that MCI was not customer specific in imposing surcharges and that it had built its billing platforms in ways that made it difficult to turn taxes and surcharges 'on' and 'off' for certain customers."). | "A former Verizon employee … confirmed that Verizon did not have a separate billing system for federal customers and commercial customers, and that Verizon's billing system did not have the capability to turn off the surcharges that were generally charged to all customers."  ¶ 27. |

Relator's Second Amended Complaint thus plainly does not allege a different *type* of wrongdoing than alleged in his first *qui tam* action.  Indeed, Relator identified the 2007 Lawsuit as a "related" case when he filed his 2009 complaint, *see* Dkt. No. 1 (Civil Cover Sheet), and he describes the 2007 Lawsuit as a "related action" in the Second Amended Complaint, *see* SAC ¶ 5.  Relator's requests for production of documents also describe the 2007 Lawsuit as a "Related" case and seek all documents produced to the Government in the earlier action.[7]  D.C. District Court Rule 40.5(3) provides that "[c]ivil . . . cases are deemed related when the earliest is still pending on the merits in the District Court and they (i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction or (iv) involve the validity or infringement of the same patent."  A plaintiff seeking to file a related suit must certify to the Court that the case falls under one of the four categories specified in Rule 40.5(3).  Here, to file the present lawsuit as "related" to the 2007 Lawsuit, Relator must have

---

[7] *See* Dkt. No. 43-1 (Request 24:  "All documents produced to the United States in Civ. Action No. 07CV0111(GK) filed in the United States District Court for the District of Columbia ("the Related Action").").

certified either that the cases "involve common issues of fact" or that they "grow out of the same

event or transaction."  Indeed, Relator later acknowledged that he gets the two suits "mixed

together in my mind because … a lot of the issues are the same."  Shea Dep. 150:3-6.

The only difference in the Second Amended Complaint is that Relator has now extended

his allegations of fraudulent billing of surcharges to 20 additional contracts.[8]  But this Court has

rejected the notion that a relator who merely identifies different contracts in a later-filed

complaint can avoid the first-to-file bar.  *Synnex Corp.*, 798 F. Supp. 2d at 73; *CDW II*, 722 F.

Supp. 2d at 41.  In *Synnex Corp.*, the Court noted that "the fact that [relator] alleges that

defendants made false claims to different agencies under different contracts does not mean that

the complaints incorporate different material elements."  798 F. Supp. 2d at 73.  Similarly, in

*CDW II*, a relator argued that the material elements of fraud in his suit differed from those in an

earlier complaint because they "involve[d] 'completely different contracts and completely

different agencies'. . . ."  The Court rejected that argument, concluding that "the text of § 3730

and the statute's underlying policies do not support the creation of a distinction between the two

complaints on this basis."  722 F. Supp. 2d at 41.

The D.C. Circuit has made clear that the relevant inquiry is "whether the [later-filed]

[c]omplaint alleges a fraudulent scheme the government already would be equipped to

investigate based on the [earlier-filed] [c]omplaint."  *Batiste*, 659 F.3d at 1209.  In *Batiste*, for

example, the D.C. Circuit compared two *qui tam* actions against federal student loan servicer

Sallie Mae and held that the second case was barred even though the first case focused on "the

---

[8] The fact that the 2007 Lawsuit has now been settled and dismissed is irrelevant for purposes of
the first-to-file bar, since the 2007 Lawsuit was indisputably pending at the time Shea filed the
current suit in 2009.  *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181,
1188 (9th Cir. 2001) ("To hold that a later dismissed action was not a then-pending action would
be contrary to the plain language of the statute and the legislative intent.  Dismissed or not, [the
first] action promptly alerted the government to the essential facts of a fraudulent scheme—
thereby fulfilling the goal behind the first-to-file rule." (internal citations omitted)).

fabrication of oral forbearance requests" and the second "focused on the offering of forbearances to unqualified borrowers." *Id*. The Court generalized that both cases alleged "fraudulent forbearance practices" and concluded that the allegations in the first complaint were sufficient to "put the U.S. government on notice of allegedly fraudulent forbearance practices." *Id*. at 1209-10.[9] Similarly, in the *Hampton* case, the D.C. Circuit applied the first-to-file bar to a subsequent suit naming different defendants and alleging that the fraud at issue occurred independently at different subsidiaries, including subsidiaries not at issue in the prior complaint. *See* 318 F.3d at 218-219.

Here, Relator's 2007 complaint put the Government on notice as to Verizon's allegedly fraudulent billing practices with respect to surcharges on government contracts, as well as information that Relator alleged supported his theory of fraud. Relator has indicated that he learned prior to filing the 2007 Lawsuit "that MCI (and later Verizon) was billing the government for surcharges as though they were surcharges imposed on the transaction when, in fact, they were seeking to collect back their own costs of doing business." *See* Moss Decl., Ex. 5 (Relator's Mem. in Support of Motion for Relator Share Award (Dkt. No. 63-1) at 9) (hereinafter "Relator Share Mem."). Relator then allegedly received "an 'insider' MCI document," which "purported to show 'the taxes and surcharges that the Federal Government is responsible for.'" *Id*. He provided notice of what he had learned to the Government,[10] and he alleged in his 2007 complaint that "Verizon Business … uses the same billing platform for its business customers to

---

[9] *See also United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 363 (7th Cir. 2010) (noting that "[t]he actions are related in the sense that both allege that [defendant] billed the federal government too much for medical devices and services," and concluding that different time periods and geographic regions were not sufficient to overcome the first-to-file bar).

[10] The FCA requires that a *qui tam* relator turn over to the Government "substantially all material evidence and information the person possesses." 31 U.S.C. § 3730(b)(2).

bill the United States without modifying its systems to reflect the terms of the FTS2001 Contract or the FTS2001 Bridge Contract."  2007 Compl. ¶ 81.

Following the 2007 complaint, the Government was on notice of Relator's allegations about Verizon's billing systems and practices.  Relator conceded as much in seeking an increased share of the 2007 settlement.  *See* Relator Share Mem. at 4 ("GSA gained valuable information about the practices of Verizon in billing enterprise customers …."); *id.* at 22 ("GSA presumably has gained increased knowledge about the carriers' practices of imposing surcharges through this litigation and will be in a better position to enforce its contract, including [a particular new contract], going forward.").  Accordingly, the Government was well positioned to investigate the billing of surcharges on other contracts as it saw fit and to pursue recovery for itself.  As this Court observed in *CDW II*, "[i]t is reasonable to conclude that the government, armed with [the allegations in an earlier *qui tam* action] about government procurement of [misrepresented] products from [defendant], was 'equipped . . . on its own' to discover the extent to which defendants had other federal procurement contracts that were governed by the [statute in question] and, in turn, whether any wrongdoing had occurred."  722 F. Supp. 2d at 43 (quoting *Hampton*, 318 F.3d at 218).  Once the Government was on notice, Relator's ability to proceed as a relator in a *qui tam* suit came to an end.  *See United States ex rel. Bane v. Life Care Diagnostics*, No. 8:06-cv-467-T-33MAP, 2008 WL 4853599, at *7 (M.D. Fla. Nov. 10, 2008) (affirming dismissal of a relator's second *qui tam* complaint and noting "the FCA requires that a relator allege the basis for all known and related false or fraudulent claims in the first-filed action and that the information be served on the Government at the time of filing.").

19

*     *     *

Whatever the merits of Relator's 2007 Lawsuit, the present action has no jurisdictional basis.  The complaint in this case alleges the same fraud asserted in the prior case; it simply seeks to extend those allegations of fraud to 20 new Verizon contracts, all of which can be identified on publicly available websites.  Because the present action is "related" to, and based on the facts underlying, the 2007 Lawsuit, it could be brought only by the Government, not a private relator.   Accordingly, Relator's Second Amended Complaint should be dismissed with prejudice for lack of jurisdiction under § 3730(b)(5).

II.  **THE SECOND AMENDED COMPLAINT MUST BE DISMISSED UNDER THE FCA'S PUBLIC DISCLOSURE BAR**

The Second Amended Complaint also must be dismissed under the FCA's "public disclosure" bar, 31 U.S.C. § 3730(e)(4).  To the extent the Realtor adds anything to the allegations in this action beyond what was in his 2007 complaint, he relies on information that was publicly available on the Internet, which is where Relator admits he found it.  That Relator may have relied on his previous consulting experiences to understand that public material is of no moment, because it is well settled in this Circuit that merely applying expertise to publicly available facts is insufficient to overcome the public disclosure bar.

A.  **The Public Disclosure Bar**

The FCA's public disclosure bar prevents a relator—but not the Government—from pursuing an action that rests on allegations that were previously "publicly disclosed" in specified sources unless the relator is the "original source" of the information disclosed.  At the time this action was filed, the bar provided:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing,

audit, or investigation, or from the news media, unless the action is
brought by the Attorney General or the person bringing the action
is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2009).[11]

A *qui tam* action is barred if it is "based upon" or "substantially similar" to information
disclosed in any of the FCA's enumerated sources.  *United States ex rel. Davis v. District of
Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012).  If the suit is based upon public disclosures, the
bar "prevents suits by those other than an 'original source' when the government already has
enough information to investigate the case and to make a decision whether to prosecute, or where
the information could at least have alerted law-enforcement authorities to the likelihood of
wrongdoing."  *Id.* (internal quotation marks omitted).  Congress thus sought to achieve "the
golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable
information and discouragement of opportunistic plaintiffs who have no significant information
to contribute of their own."  *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d
645, 649 (D.C. Cir. 1994).

The public disclosure bar forecloses *qui tam* actions "where all of the material elements
of the fraudulent transaction are already in the public domain" and the relator merely "comes
forward with additional evidence" that cumulatively adds to information already in the public
domain.  *Id.* at 655.  The bar therefore "precludes suits by individuals who base *any part* of their
allegations on publicly disclosed information."  *United States ex rel. J. Cooper & Assocs., Inc. v.*

---

[11] Congress amended the public disclosure bar in the Patient Protection and Affordable Care Act
("PPACA"), which was signed into law on March 23, 2010.  PPACA's amendments do not apply
retroactively to cases pending at the time of enactment, *see Schindler Elevator Corp. v. United
States ex rel. Kirk*, 131 S. Ct. 1885, 1889 n.1 (2011); *Graham Cnty. Soil and Water Conservation
Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010); *United States ex rel.
Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 29 n.7 (D.D.C. 2012),
and, in any event, as explained below, the outcome of this case would be the same under either
version of the bar.

*Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006) (emphasis in original

and internal quotation marks omitted); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337,

351–52 (4th Cir. 2009) ("Section 3730(e)(4)(A)'s public disclosure jurisdictional bar

encompasses actions even partly based upon prior public disclosures.").  It is not necessary that

"the relevant public disclosures irrefutably prove a case of fraud[;] [i]t is sufficient that the

publicly disclosed transaction is sufficient to raise the inference of fraud."  *United States ex rel.*

*Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) (internal quotation marks,

citation omitted).

Further, the D.C. Circuit has made clear that the relator cannot overcome the public

disclosure bar simply by utilizing his "expertise" to make allegations of fraud based on publicly

disclosed facts.  *Springfield Terminal Ry. Co.,* 14. F.3d at 655 (using "[e]xpertise" in a given

field to deduce that a fraud has been committed does "not in itself give a *qui tam* plaintiff the

basis for suit when all the material elements of fraud are publicly available, though not readily

comprehensible to nonexperts").  Indeed, a *qui tam* is barred where the relator merely possesses

"background information which enables [him or her] to understand the significance of a publicly

disclosed transaction or allegation."  *Id.* (citation and internal quotation marks omitted).

**B.**     **The Public Disclosure Bar Forecloses Relator's Claims Because They Are**
           **Based On Publicly Available Contract And Billing Information**

The public disclosure bar squarely forecloses this action.  The claims in the Second

Amended Complaint are comprised of two material elements: (1) that 20 contracts between

Verizon and various government entities disallowed certain surcharges, and (2) that Verizon

invoiced the government for these surcharges.  *See* SAC ¶ 28 ("Verizon improperly billed for

Non-Allowable Tax-Like Charges on the following federal telecommunication contracts ….").

As discussed in Section III *infra*, both of these allegations are wholly conclusory and insufficient

because the Relator fails to identify which surcharges Verizon actually invoiced to the Government or any provisions within the 20 contracts that disallow them.  The allegations also fail because Relator admits that even the conclusory information he possesses about the 20 named contracts and the contents of invoices that allegedly contain impermissible charges was publicly available.  He found it on the Internet.

> **1.     Relator's Information Regarding The Content Of The Contracts Is From The Internet**

As explained in more detail below, *see infra* pp. 32-33, for 17 of the 20 contracts, Relator pleads only the contract name and number and literally nothing at all about the content of the contract.  *See* SAC ¶ 28.  Relator (or anyone else) could identify these contract names and numbers simply by searching publicly available websites,[12] and Relator admitted that he compiled his list from such websites.  *See* Shea Dep. 21:12-17 ("Most of these from this specific list came from a contract—a document on Verizon—I believe it was Verizon's website[.]"); *id.* 151:18-153:4 & Ex. 2 (source of contract descriptions, which Relator found online).[13]  As for the three contracts for which Relator sets forth minimal detail other than the contract name and number, that information also can be found on the Internet, as Relator also admitted:

---

[12] *See, e.g.*, Moss Decl. ¶ 4 & Ex. 3 (online Verizon Federal Contract User Guide) (identifying by name and number the contracts named in SAC ¶¶ 28(a), 28(b), 28(c), 28(f), 28(h), 28(i), 28(j), 28(k), 25(l), & 28(m)); *id.* ¶ 7 & Ex. 6 (DoD website) (identifying by name and number the contract named in ¶ 28(e)); *id.* ¶ 8 & Ex. 7 (FedBixOpps.com website) (identifying by name and number the contract named in ¶ 28(g)); *id.* ¶ 9 & Ex. 8 (online Verizon GSA Schedule Program) (identifying by name and number the contract named in ¶ 28(d)).

[13] It is appropriate for the Court to consider evidence outside the pleadings in evaluating this aspect of Defendants' motion.  The public disclosure bar affects the jurisdiction of the Court.  *See* 31 U.S.C. § 3730(e)(4) (2009).  In considering a motion to dismiss for lack of subject matter jurisdiction, courts routinely rely on a factual record.  *See, e.g.*, *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (noting that the Court could resolve factual questions in considering a motion to dismiss for lack of subject matter jurisdiction); *United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 37 n.11 (D.D.C. 2012) (considering relator's declaration in support of his jurisdictional argument under the public disclosure bar).  Indeed, even if the bar were not jurisdictional, the Court could consider evidence on this issue.  *See* Fed. R. Civ. P. 12(d).

| Paragraph(s) | Contract | Allegation / Source |
|---|---|---|
| ¶ 29 | FEMA Contract No. HSFEHQ-04-D-0023 | Relator pleads that the contract allegedly "did not mention Non-Allowable Tax-Like Surcharges," a statement that, even if true, does not allege that the contract's language disallows any particular surcharge. Because Relator does not plead any actual contractual language, he effectively has done nothing more than identify the contract itself, which is information that can be found on Verizon's website.  In his deposition, Relator could not recall having ever seen this contract but admitted that he found the contract number and description on the Internet.[14] |
| ¶ 30 | WITS 3 Contract No. GS11T08BJD6001 | Relator quotes Sections H.16 and H.27 of the contract.  Relator admitted that he found this contract language on the Internet.[15] |
| ¶¶ 32-40 | Verizon Wireless Federal Supply Schedule, Contract No. GS-35F-0119P | Relator quotes from modifications 7, 8, 12, 18, and 20 to the contract.  Relator admitted that he found on the Internet all of the modifications to this contract that he possesses.[16] |

Because Relator obtained the facts that he alleges regarding the contracts on the Internet (Verizon's website or government websites or other publicly available websites, *see* Shea Dep. 21:21:-22:10), this information was publicly disclosed.

> ## 2.     Relator's Information Regarding The Content Of The Invoices That Allegedly Contain Impermissible Charges Is From The Internet

Although Relator did not plead any specific facts regarding Verizon's invoices, he admitted that what he knows about which allegedly impermissible surcharges were actually

---

[14] *See* Shea Dep. 113:1-3 ("I found this one, that contract number, on a description kind of a – on Verizon's website"); 116:7-9( "Do you think you have a copy of this contract?  I'm not sure."); 113:22-114:4 ("Do you know if you have a copy of it?  Again, I have – I have lots of copies of chunks of these contracts.  This one on FEMA, again, I don't have any instant recall.").

[15] Shea Dep. 120:6-7 ("Where did you get it?  Most likely online.")

[16] Shea Dep. 127:12-13; 137:9-10; 142:4-16.

charged on Verizon's invoices was also gleaned from the Internet.[17]  For some contracts, Relator

was able to find online what he described as "mock-up invoicing" or "training invoices," which

in some cases contained a section on taxes and surcharges.[18]

For example, Relator explained in his deposition that "with a lot of these things, you can

find these [mock-up invoices] by taking the contract number…and you just stick them in

Google."  Shea Dep. 47:1-6.  He explained that these billing "mock-ups" are not the "actual

billing" but do include the "billing format," *id.* at 47:14-16, and a "section on taxes and

surcharges," *id.* at 47:22-48:1.  Relator remembered "vividly" seeing tax and surcharge

provisions in one of the 20 contracts, *id.* at 53:7-12, and recalled or thought he recalled "mock-

up" bills for six other contracts, *id.* at 48:5-10; 55:16-19; 63:5-9, 103:18-22, 109:16-110:1;

124:6-10, which he claimed "provide[d] [him] with enough information to know what surcharges

are charged [on the relevant contract]," *id.* at 55:20-56:6.

That the documents that Relator admits he found on the Internet do not appear to be

actual Verizon invoices is of no moment.  What matters is that, according to Relator, information

regarding which surcharges Verizon charged to government customers can be found on the

Internet.  They are thus publicly disclosed for the purposes of the public disclosure bar.

---

[17] In his deposition, Relator stated that he "got a sample bill of a wireless, like, a Blackberry
device from someone on the Judiciary Committee."  Shea Dep. 127:13-16.  However, Relator
conceded that the only surcharges shown on this bill—the Federal Universal Service Charge and
Regulatory Charge—were the very ones that the contract modification language quoted in his
Second Amended Complaint indicates were permitted to be charged under the Wireless
Schedule, and that he was aware of no contract or modification language that disallowed these
charges.  *See* Shea Dep. 129:1-14; 131:1-10; 133:15-136:1.  Accordingly, this Wireless Schedule
invoice does not support the allegations in the Second Amended Complaint that Verizon charges
impermissible surcharges, and it thus is irrelevant to the public disclosure bar analysis.

[18] Shea Dep. 46:11-16; 47:22-48:1; 48:10; 50:6-8; *see also id.* at 53:16-54:2 (describing an
online mock-up bill for the contract named in SAC ¶ 28(e)); 55:16-56:21 (describing same as to
contract named in ¶ 28(f)).

### 3.     Material Available On Public Internet Sites Is Publicly Available

Earlier this year, this Court held that websites that are available to the general public are "news media" for purposes of the public disclosure bar. *United States ex rel. Green v. Svc. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012).[19]  In *Green*, the Court dismissed a lawsuit where "the fact that defendant contractors had service contracts with federal agencies is readily available on the Internet" via a labor union's website. *Id*. at 31.  The Court noted that the public disclosure bar is given "a broad sweep," *id*. at 32 (quoting *Schindler Elevator*, 131 S. Ct. at 1891), and it concluded that the key consideration is the "ready accessibility" of the information, and not whether the website is a news source in the traditional sense, *Green*, 843 F. Supp. 2d at 33; *see also United States ex rel. Brown v. Walt Disney World Co*., No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (Wikipedia qualifies as "news media"); *United States ex rel. Unite Here v. Cintas Corp*., No. C 06-2413 PJH, 2007 WL 4557788, at *14 (N.D. Cal. Dec. 21, 2007) (finding that "[t]he 'fact' of the contracts between [defendant] and the federal government was publicly disclosed in the news media, as that information was available on the Internet").

### C.    Any Purportedly Non-Public Information Relied Upon By Relator Was Merely Cumulative

As explained above, the elements of Relator's claims have been publicly disclosed. Although Relator has alleged very little regarding the content of the 20 contracts at issue, what he described about them can be—and in fact was—found on the Internet.  Similarly, although he has alleged very little regarding the content of Verizon's invoices, what he knows about specific allegedly impermissible charges on the contracts at issue in this action he found on the Internet.

Relator cannot avoid the public disclosure bar by pointing to the limited other

---

[19] PPACA did not alter the "news media" disclosure provision.

information he cites as the basis for his allegations, because it adds only cumulative information to the "essential elements" of his allegations that were already publicly disclosed.  As the D.C. Circuit has explained, where the material elements of an allegation have been publicly disclosed, the case is barred where the Relator merely "comes forward with additional evidence." *Springfield Terminal Ry. Co.,* 14 F.3d at 655.  The only specific facts Relator has identified as the basis for his current suit that he does not admit he found on the Internet are (1) an MCI document Relator says he received in 2004, *see* SAC ¶ 4, and (2) the contention that Verizon does not have a separate billing system for federal and commercial customers and that its "billing system do[es] not have the capability to turn off the surcharges that were generally charged to all customers," *see id.* ¶ 27.  This information is simply "additional evidence" supporting the material elements of Relator's allegations.[20]

 The 2004 document lists taxes and surcharges, but Relator admits that these taxes and surcharges are not charged on all of the 20 contracts at issue.  Shea Dep. 165:6-14 ("Some of them will be [charged on the 20 contracts], some of them won't be.  It's going to vary depending on what the services are.  It's going to vary on where the services are provided.  It's going to vary on, you know, the billing platform."); *id.* at 170:10-12 ("[S]ome of these charges aren't going to appear on some of the services under some of the contracts").  Accordingly, the 2004

---

[20] In any event, these allegations were publicly disclosed in the 2007 Lawsuit.  *See supra* Section I.  Because the 2007 complaint was under seal at the time the 2009 complaint was filed, Relator may argue that the disclosure was not "public" for purposes of the public disclosure bar.  *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 46-47 (D.D.C. 2007).  That argument, however, fails for multiple reasons.  Most notably, it ignores the fact that the primary purpose of the rule is to bar suit where the government is constructively on notice of the allegations.  *See Davis*, 679 F.3d at 836 (public disclosure bar prevents suits "when the government already has enough information to investigate the case and to make a decision whether to prosecute" (internal quotation marks omitted)).  Moreover, the 2007 complaint was unsealed (*see* Dkt. No. 56, Civ. No. 1:07-cv-00111) over a year *before* Relator served the Second Amended Complaint, which was the first time that Relator identified 17 of the contracts that he contends involved improper billing.  Finally, these allegations fall at the core of what Relator is precluded from alleging under the first-to-file bar.  *See supra* Section I.

document adds little to the billing information Relator found on the Internet in preparing his case. The knowledge about Verizon's billing system from a former Verizon employee, SAC ¶ 27, is similarly cumulative of—and less specific than—the information Relator located on the Internet. Indeed, Relator conceded that Verizon has multiple billing systems, Shea Dep. 195:9-14, that the Verizon employee did not indicate which billing system he was referring to, *id.* at 195:15-20; 212:7-9, and that Verizon does in fact have the capability to turn off surcharges or to credit back surcharges or use other work-arounds in order to avoid charging surcharges to particular customers, *id.* at 227:17-231:2. Against this backdrop, Relator's purported "inside" information about Verizon's billing systems is at most "additional evidence" that is far from sufficient to avoid the public disclosure bar. *Springfield Terminal Ry.*, 14 F.3d at 655; *see also Bernard Hodes Group*, 422 F. Supp. 2d at 235 n.10 (bar "precludes suits by individuals who base *any part* of their allegations on publicly disclosed information" (emphasis in original)).

Finally, Relator cannot avoid the public disclosure bar by pointing generally to his industry experience and claiming that it allowed him to recognize the significance of the publicly disclosed contract and billing information. In his deposition, when asked for the source of allegations against Defendants, Relator referred repeatedly to what he had learned through his years as a consultant on telecommunications contracts—none of which were federal government contracts, let alone any of the contracts named in this suit—and at one point referred to this knowledge as the "special sauce" that allowed him to make sense of the "salt and pepper" that "everybody knows."[21] The D.C. Circuit has clearly held, however, that such "expertise" is not sufficient to surmount the public disclosure bar. *See Springfield Terminal Ry.*, 14 F.3d at 655

---

[21] Shea Dep. 70:17-71:1; *see also, e.g.*, *id.* at 137:12-13 ("Again, a lot of my knowledge in terms of what this stuff is from my industry stuff."); *id.* at 23:17-18 (explaining how "industry knowledge" helps him understand the bills and contracts); *id.* at 34:21-35:2 (stating that his "industry experience" leads him to expect that "there's going to be a whole heck of a lot of charges that are not allowable").

("[T]here may be situations in which all of the critical elements of fraud have been publicly

disclosed, but in a form not readily accessible to most people, *i.e.*, engineering blueprints on file

with a public agency.  Expertise in the field of engineering would not in itself give a *qui tam*

plaintiff the basis for suit when all the material elements of fraud are publicly available, though

not readily comprehensible to nonexperts.").

> ### D.    Relator Is Not The Original Source

Because Relator's new allegations are "based upon" publicly disclosed materials found

on the Internet, his lawsuit "can proceed only if he is an 'original source.'"  *Davis*, 679 F.3d at

837.  Relator, however, is obviously not an "original source" of the contract and billing

information about the 20 listed contracts that he found on the Internet.  Relator lacks "direct and

independent knowledge of" that information.  31 U.S.C. § 3730(e)(4)(B) (2009).  "'Direct'

signifies marked by absence of an intervening agency," and "'[i]ndependent knowledge' is

knowledge that is not itself dependent on the public disclosure."  *Springfield Terminal Ry. Co.*,

14 F.3d at 656 (internal citations and quotation marks omitted).  The D.C. Circuit has held "this

definition to impose a conjunctive requirement—direct *and* independent—on *qui tam* plaintiffs."

*Id.* (emphasis in original).  Relator admitted that he did not have "independent" or "direct"

access to Defendants' contracts and bills; all he saw were "chunks" of contracts and "mock-up"

bills that he found on publicly available sources such as the Internet.

Relator would not be an "original source" even under PPACA's amended definition of

the term.[22]  Relator could not have "voluntarily disclosed" the information that he has about the

contracts or invoices to the Government "prior to" the "public disclosure" of that information on

---

[22] Relator's Second Amended Complaint asserts separate causes of action for conduct occurring before and after the date of enactment of PPACA, suggesting that PPACA's amendments apply to claims submitted after its enactment.  *But see supra* n.11 (noting that PPACA does not apply retroactively to cases pending on the date of enactment).  Even if PPACA did apply to conduct after March 23, 2010, it would not affect the outcome of this motion.

the Internet, 31 U.S.C. § 3730(e)(4)(B) (2012),[23] since he admitted he found it on the Internet.[24]

Further, he does not bring any additional information that is "independent of and materially adds

to the publicly disclosed allegations or transactions," because—as discussed above—the only

other information on which Relator bases his lawsuit is cumulative.  Relator has never been an

employee of Verizon or a consultant to a federal government agency with respect to a Verizon

contract, Shea Dep. 16:3-11; 20:2-9, and does not claim to have had direct access to Verizon's

contracts or invoices.  To the contrary, Relator claims to have applied "expertise" he gained as a

commercial consultant to publicly disclosed information about Verizon, which is insufficient.

"If a relator merely uses his or her unique expertise or training to conclude that the material

elements already in the public domain constitute a false claim, then a *qui tam* action cannot

proceed."  *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 688

(D.C. Cir. 1997).

*      *      *

For all of these reasons, this follow-on action by Relator—which does no more than

assert conclusory allegations regarding material he admits is available on the Internet—is

foreclosed by § 3730(e)(4)'s "public disclosure" bar.

---

[23] After PPACA, § 3730(e)(4)(B) provides:

> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

[24] *See, e.g.*, Shea Dep. 21:12-17; 25:4-7; 40:16-41:5; 51:5-8; 53:21-54:2; 55:14-15; 56:7-8; 59:1-3; 62:15-16; 100:19-21; 104:1-2; 106:11-13; 108:7-8; 109:12-15; 110:2-3; 113:1-3; 119:9-17; 120:2-7; 127:4-6; 137:9-13; 142:9-16; 147:12-13.

**III.   THE SECOND AMENDED COMPLAINT FAILS TO SATISFY THE PLEADING STANDARDS OF RULES 8 AND 9(b)**

The Second Amended Complaint must also be dismissed under Federal Rule of Civil Procedure 12(b)(6) because it fails to meet the pleading requirements of Rules 8 and 9(b).

**A.   Applicable Legal Standards**

Rule 8 requires a plaintiff to allege facts that, if true, would plausibly entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  "Instead, the complaint must plead facts that are more than 'merely consistent with' a defendant's liability; 'the pleaded factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186 (D.D.C. 2011) (quoting *Iqbal*, 556 U.S. at 663 (internal alterations omitted)); *see also Sharma v. District of Columbia*, --- F. Supp. 2d ---, Civ. A. No. 10-1033(GK), 2012 WL 3195141, at *4 (D.D.C. Aug. 8, 2012) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by facts set out in the complaint." (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994))).  Dismissal under Rule 8 is appropriate where a complaint fails to provide facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Because the FCA is an anti-fraud statute, it is well established that FCA claims must also meet the more stringent pleading requirements of Rule 9(b), which requires a complaint to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see, e.g., United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-552 (D.C. Cir. 2002).  This Court has specified that under Rule 9(b)'s heightened standard, an "FCA relator must state the time, place, and contents of the false representations, the facts misrepresented, and what was

31

obtained or given up as a consequence of the fraud." *United States ex rel. Bender v. N. Am. Telecommc'ns, Inc.*, 686 F. Supp. 2d 46, 49 (D.D.C. 2010); *see also United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (same).  In other words, a relator must allege the "who, what, when, where, and how" of the fraud.  *Boone v. MountainMade Found.*, 684 F. Supp. 2d 1, 8 (D.D.C. 2010).

### B.     The Second Amended Complaint Fails To Plead Facts Sufficient To Support The Inference That Fraud Occurred

The Second Amended Complaint fails the pleading requirements of Rule 8, much less the heightened pleading requirements of Rule 9(b).  It lists 20 Verizon government contracts by name and number and states "on information and belief" that Verizon improperly billed certain surcharges under the contracts.  SAC ¶ 28.  But the Second Amended Complaint does not allege that any *particular* surcharge was prohibited under any *particular* contract and does not offer any particularized allegations regarding the purportedly fraudulent charges submitted by Defendants, including what they were for, when and by whom they were submitted, and what contract provision they purportedly violated.  As explained below, the Second Amended Complaint is deficient in numerous respects.

### 1.     The Second Amended Complaint Fails To Demonstrate That The Named Contracts Prohibited The Surcharges

The Second Amended Complaint alleges that "Verizon improperly billed for Non-Allowable Tax-Like Charges"[25] on 20 of its contracts with the federal Government.  SAC ¶ 28. But the Second Amended Complaint provides no support for its conclusory assertion that the specified charges were not permitted under the 20 contracts at issue.  It recognizes that whether a particular tax or surcharge may be billed to the Government turns on the particular terms of each

---

[25] *See* SAC ¶ 3 (defining "Non-Allowable Tax-Like Charges"); *see supra* note 5.

contract and that those terms vary between contracts.  *See, e.g.,* SAC ¶¶ 17, 22-23 (articulating

the differences between a "firm-fixed-price contract" (¶ 17) and a contract that "excludes

Federal, State, and local taxes and duties from the contract price" (¶¶ 22-23)); *id.* ¶ 29 (alleging

merely that "*many*" of the 20 listed contracts "never discussed Non-Allowable Tax-Like

Charges" (emphasis added)); *id.* ¶ 30 (conceding that some of the 20 listed contracts

"specifically excluded certain surcharges from the list price," and thus permitted those

surcharges to be billed in addition to the list price).  Therefore, for this Court to "draw the

reasonable inference that the defendant is liable for the misconduct alleged," *Kane Co*., 798 F.

Supp. 2d at 193, and in order to allege "the circumstances constituting fraud," *id.*, Relator would

need to plead facts sufficient to demonstrate a *particular* surcharge was barred under a *particular*

contract and that the Government was fraudulently billed for that surcharge.

      Relator's 2007 Lawsuit set forth with specificity the provisions of the contracts at issue.

*See* 2007 Compl. ¶¶ 28-64.  The Complaint acknowledged that the contracts permitted certain

surcharges while prohibiting others.  *See id.* ¶ 66 ("The Federal Universal Service Fund

surcharge, the PICC surcharge, and certain other taxes were acceptable line item charges under

the FTS2001 Contract."); *id.* ¶ 67 ("No other surcharges were to be included as separate line

items on the invoices under the FTS2001 Contract.").  In contrast to the 2007 complaint, the

Second Amended Complaint in the present action contains almost no description of the

contractual provisions at issue.  The Second Amended Complaint does not provide *any*

*information at all* about 17 of the 20 named contracts (beyond contract name and number).  And

for the other three, it provides only minimal allegations that are insufficient to show improper

billing by Defendants:

*First,* as to Verizon's contract with the Federal Emergency Management Agency ("FEMA"), the Second Amended Complaint includes only a single sentence stating simply that the contract "did not mention Non-Allowable Tax-Like Charges."  SAC ¶ 29.  But the fact that the FEMA contract purportedly is *silent* on the issue of surcharges does not demonstrate that any particular surcharge was prohibited.

*Second*, the Second Amended Complaint concedes that Verizon's WITS3 Contract "specifically excluded certain surcharges from the list price, like the Federal Universal Service Charge," permitting them to be charged separately.  SAC ¶ 30.  The Second Amended Complaint thus alleges only that Verizon "mischaracterized" the Federal Universal Service Charge as a "mandatory tax."  But the purported mischaracterization is not alleged to have been in some bill or charge or any other statement submitted or drafted by Verizon; it is in the contract language itself, which Relator never alleges was drafted by Verizon—as opposed to by the Government.

*Third*, the Second Amended Complaint describes at length certain modifications to the "Verizon Wireless Federal Supply Schedule" contract.  *See* SAC ¶¶ 32-40.  But the Second Amended Complaint does not cite the operative provisions of the agreement that dictate whether Verizon may or may not impose surcharges nor otherwise allege facts showing that Verizon was prohibited from charging surcharges under the Wireless Schedule.

The allegations regarding the Verizon Wireless Federal Supply Schedule illustrate the deficiencies of Relator's pleading.  Rather than point to the specific contractual provisions that address whether and what surcharges can be billed, the Second Amended Complaint points to language from contract modifications to assert that Verizon misled the Government about the nature of its surcharges.  The language cited, however, belies Relator's allegations.  For example, the Second Amended Complaint alleges that Modification 8 to the Wireless Schedule suggested

34

that Verizon was "required" to bill the "Federal Universal Service" surcharge.  SAC ¶ 34.  But a few lines later, Modification 8 states: "*In addition to surcharges and fees that we are required to collect*, we will also collect charges to recover or help defray costs of taxes and governmental surcharges and fees imposed on us…. *These charges include*, among others, a Regulatory Charge and *a Federal Universal Service Charge*…"  *Id.* (emphasis added).  Relator acknowledges the clarifying language but asserts (incorrectly) that it appears "[o]nly [in] the fine print" and that it is "in the second half of the modification."  *Id.* ¶ 35.  The Second Amended Complaint then alleges—without further basis—that "Verizon's careful wordsmithing" in the modifications indicates that "Verizon knew [the surcharges] were not allowable charges under the contract."  *Id.* ¶ 41.  But that allegation makes an unsubstantiated and conclusory logical leap, simply assuming that the charges were not allowable, while the Second Amended Complaint does not identify any contractual term in the Verizon Wireless Federal Supply Schedule that prohibits them.

Instead of pointing to the language of the contracts, Relator seeks to rely on various provisions of the Federal Acquisition Regulations ("FAR"), *see* SAC ¶¶ 16-25, but those provisions themselves make clear that it is the language of the contracts that ultimately governs whether charges are allowable.  Thus, Relator generally asserts that "[t]hese contracts incorporated FAR provisions which stated that 'the contract price includes all applicable Federal, State, and local taxes and duties,'" and that "Verizon had no basis for subsequently collecting surcharges under these contracts."  SAC ¶ 29.  But a mere seven paragraphs earlier in the Second Amended Complaint, Relator concedes that the application of the FAR provisions is dependent on the particular terms of the contract.  *Id.* ¶ 22; *see* 48 C.F.R. § 52.229-4(b) ("*Unless otherwise*

*provided in th[e] contract*, the contract price includes all applicable Federal, State, and local

taxes and duties." (emphasis added)).

Thus, the Second Amended Complaint fails to plead facts sufficient to determine which

particular taxes and surcharges Relator contends were not permitted under each of the 20 listed

contracts.

### 2. The Second Amended Complaint Lacks Allegations Sufficient To Demonstrate That Any Improper Billings Actually Occurred

Not only does the Second Amended Complaint fail to plead facts sufficient to

demonstrate whether *particular* surcharges were prohibited under *particular* contracts, but it also

fails to plead facts sufficient to show what particular surcharges were allegedly imposed on the

Government under the particular contracts.  Relator does not allege knowledge of Verizon's

billing practices with regard to the specific contracts named or over any particular time period.

Instead, the Second Amended Complaint includes the conclusory allegation that, on "information

and belief," "Verizon improperly billed … on the following federal telecommunication

contracts."  SAC ¶ 28.

The sole basis set forth in the Second Amended Complaint for the conclusion that the

taxes and surcharges it lists were billed under each of the listed contracts appears to be the

allegation (1) that Relator learned from a former Verizon employee that Verizon allegedly "did

not have a separate billing system for federal customers and commercial customers, and that

Verizon's billing system did not have the capability to turn off the surcharges that were generally

charged to all customers," SAC ¶ 27; and (2) that in 2004 Relator received an MCI document

indicating that MCI was charging certain fees under an unspecified contract, *see id.* ¶ 4.  Those

allegations, however, are insufficient to support the sweeping inference that each of the Verizon

companies that entered into the 20 contracts at issue in this case engaged in improper billing.

Among other things, the allegations do not identify when Relator supposedly learned the information from the former employee, over what time period Defendants allegedly maintained the billing system described, for which contracts such a billing system was used, and what contract and what period of time the MCI document covered.  The Second Amended Complaint, for example, provides no basis to infer that alleged billing practices by old MCI, *see* SAC ¶ 3, affected any particular current Verizon entity or affiliate, such as Cellco Partnership, which, as the Second Amended Complaint notes, is a joint venture between Verizon and Vodafone (a British company) with no alleged connection to old MCI, *see, e.g.*, *id.* ¶ 6 (listing various Verizon subsidiaries), ¶ 10 (Cellco Partnership).  Without those details, there is an insufficient basis under Rule 9(b) to infer that the billing system purportedly described by the former employee supports Relator's allegations as to any particular contract at issue.

At bottom, the Second Amended Complaint consists of nothing more than generalized speculation that Defendants may have billed some *unspecified* non-allowed surcharges to the Government under *some* contracts over some *unspecified* period of time in some *unknown* amount.  But such a "possibility of misconduct" is insufficient to satisfy the pleading standards of Rule 8, let alone Rule 9(b).  *See Iqbal*, 556 U.S. at 678; *cf. Kane*, 798 F. Supp. 2d at 204 (finding pleadings adequate where the Relator and the Government detailed "the circumstances of the fraudulent scheme and the location, Kane Company executive-level meetings").

### 3.    The Second Amended Complaint Fails To Identify *When* The Allegedly Fraudulent Claims Were Made

Also absent from the Second Amended Complaint is any allegation identifying the time period of the fraud.  The D.C. Circuit has held that a *qui tam* complaint must be dismissed for lack of particularity under Rule 9(b) if it fails to specify the start date or duration of the allegedly fraudulent scheme.  *See Williams*, 389 F.3d at 1257 ("Several paragraphs nebulously allege that

the period in question is 'at least through 2002,' but nowhere does the complaint allege a start date."). The Second Amended Complaint is even more deficient than the one dismissed in *Williams*, for it lacks any reference to any time period for any of the allegedly false billings. *See Bender*, 686 F. Supp. 2d at 51 (dismissing complaint that states when contract commenced but "contains no further details as to when the fraud began or for how long it existed"); *Kane*, 798 F. Supp. 2d at 204 (noting that the Government provided "a specific time period" and that even the Relator, who alleged "a more open-ended time-period," set forth the date the scheme allegedly began). "While a complaint that covers a multi-year period may not be required by Rule 9(b) to contain a detailed allegation of all facts supporting *each and every instance* of submission of a false claim, *some information on the false claims* must be included." *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (emphasis added). Relator's complaint fails to specify even "any representative claims" from among untold numbers of claims. *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*, 778 F. Supp. 2d 37, 53 (D.D.C. 2011).

### 4. The Second Amended Complaint Fails To Identify With Particularity *Who* Made The Allegedly Fraudulent Statements Or Claims

Finally, the Second Amended Complaint is deficient because it fails to "identify individuals allegedly involved in the fraud." *Williams*, 389 F.3d at 1256; *see also Bender*, 686 F. Supp. 2d at 53 ("[False Claims Act] cases in this circuit reveal that specificity regarding the identities of individual actors is required." (internal citations omitted)). The Second Amended Complaint does not mention a single individual who allegedly was involved with or had knowledge of the purported fraud. *Cf. Kane*, 798 F. Supp. 2d at 204 (noting that both "Relator and the Government also specifically identify those Kane Company personnel involved in perpetrating the scheme"). Such "imprecise pleading" fails to give the defendant enough

information to respond and "subjects it 'to vague, potentially damaging accusations of fraud,'

which is precisely what Rule 9(b) seeks to avoid." *Digital Healthcare*, 778 F. Supp. 2d at 53

(quoting *Williams*, 389 F.3d at 1257).

Having failed to identify any individuals allegedly engaged in the fraud, it is no surprise

that the Second Amended Complaint also fails adequately to allege scienter.  To state a claim

under the FCA, a Relator must show that the defendant acted with scienter—mere mistakes are

insufficient.  *See, e.g., United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274

(D.C. Cir. 2010) ("Congress clearly had no intention to turn the FCA, a law designed to punish

and deter fraud, into a vehicle for either 'punish[ing] honest mistakes or incorrect claims

submitted through mere negligence'…." (quoting S. Rep. No. 99-345 at 7 (1986), *reprinted in*

1986 U.S.C.C.A.N. 5266, 5272)).  While state of mind need not be pled with particularity under

Rule 9(b), the Second Amended Complaint fails to satisfy even Rule 8 in this regard.  Scienter is

a necessary element of an FCA claim that requires more than simply the "collective knowledge"

of a corporation.  *See Sci. Applications Int'l Corp.*, 626 F.3d at 1275 (rejecting "collective

knowledge" theory of FCA scienter, which would have allowed "a plaintiff to prove scienter by

piecing together scraps of 'innocent' knowledge held by various corporate officials").  The

Second Amended Complaint, however, fails to allege any facts about who submitted the

allegedly false claims to the Government, who knew about the allegedly impermissible

surcharges, and whether those who submitted the claims knew about the contract language

prohibiting those surcharges.

## IV.   DISMISSAL SHOULD BE WITH PREJUDICE

Dismissal of Relator's Second Amended Complaint should be with prejudice.  Relator

has already had an opportunity to amend his complaint, and any further amendment would be

futile.  Relator cannot simply plead around the first-to-file and public disclosure bars.  As

discussed above, those bars are triggered by the very nature of Relator's suit.  No amount of added detail can alter the fact that this suit is based on the same general allegations that underlie the 2007 Lawsuit and that the material elements of the allegations of the Second Amended Complaint have been publicly disclosed.

Even if the Court were to dismiss based only on the failure to satisfy the pleading requirements of Rules 8 and 9(b), dismissal should be with prejudice.  It is apparent from the deposition of Relator that he lacks sufficient information to state his alleged claims with particularity.  Relator has not even read many of the contracts at issue and has seen only "chunks" of the others.  *See, e.g.*, Shea Dep. 117:1-3 ("I have not read every single one of these contracts in their entirety because I don't have them."); *id.* at 28:12-14, 18-20; 34:4-5; 40:20-21; 51:5-6; 100:20-21; 104:7-8; 106:18-19.  The only way for Relator to add the specific allegations required would be to rely on discovery materials obtained from Defendants.  It is well established, however, that a relator cannot use materials obtained in discovery to cure pleading deficiencies in an FCA case.  *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 231 (1st Cir. 2004) ("[A] qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery."), *abrogated on other grounds by United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40 (1st Cir. 2009); *see also United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008); *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 559 (8th Cir. 2006); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1313-14 n.24 (11th Cir. 2002).

The FCA represents a careful compromise.  It provides significant incentives for private parties to file suit for false claims alleged to have been submitted to the Government, *see* 31

U.S.C. § 3730(d) (permitting awards of 15-30% of recovery plus fees and costs), but private parties can bring suit only if they possess material *non-public* information that a false claim has been submitted, *see United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 309 (5th Cir. 1999) ("[T]he False Claims Act grants a right of action to private citizens only if they have *independently obtained* knowledge of fraud." (emphasis added)), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009).  As noted above, a *qui tam* action by a private relator is barred if it is based on information that has already been "publicly disclosed" unless the relator is the "original source" of the information.  *See* 31 U.S.C. § 3730(e)(4).  Moreover, the Act mandates that a "copy of the complaint and *written disclosure of substantially all material evidence and information the person possesses* shall be served on the Government" at the time a complaint is filed.  31 U.S.C. § 3730(b)(2) (emphasis added).  Permitting a *qui tam* relator to cure pleading deficiencies based on information obtained in discovery would undermine these limitations.  *See Karvelas,* 360 F.3d at 231; *Joshi*, 441 F.3d at 560.

Prohibiting *qui tam* relators who have failed to meet 9(b)'s particularity requirement from using discovery to replead is necessary to fulfill the purpose of Rule 9(b).  As the D.C. Circuit has emphasized, one of the principal purposes of Rule 9(b) is to "'prevent[ ] the filing of a complaint as a pretext for the discovery of unknown wrongs.'"  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (citations omitted); *see also Karvelas,* 360 F.3d at 231 (noting ''[t]he reluctance of courts to permit qui tam relators to use discovery to meet the requirements of Rule 9(b) reflects, in part, a concern that a qui tam plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown wrongs.'' (internal quotation marks, citation omitted)); *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d

41

81, 97 n.17 (D.D.C. 2010); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  Especially where, as here, the Second Amended Complaint does not come close to satisfying Rule 9(b), dismissal with prejudice is required to prevent Relator from bypassing the requirements of Rule 9(b) altogether by demanding discovery first and attempting to file a sufficient complaint later.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Second Amended Complaint with prejudice.


Dated:  September 12, 2012          Respectfully submitted,

 /s/ Randolph D. Moss
_____
Randolph D. Moss (D.C. Bar No. 417749)
Jennifer M. O'Connor (D.C. Bar No. 460352)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
randolph.moss@wilmerhale.com

*Attorneys for Defendants*